**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | **CASE NO. 4:20-cr-83** |
| | ) | |
| **Plaintiff,** | ) | **JUDGE DONALD NUGENT** |
| | ) | |
| **vs.** | ) | |
| | ) | |
| **WILLIE ANTONIO SAMUELS-BALAYAQUEZ** | ) | **MOTION TO DISMISS INDICTMENT** |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

Now comes defendant, Willie Antonio Samuel-Baldayaquez, by and through his undersigned attorney, and moves this Court to dismiss the indictment in the above captioned case on the grounds that § 1326 violates the equal protection gurantee of the Fifth Amendment under the standard articulated in Village of Arlington Heights v. Metropolitan Housing Devlopment Corp, 429 U.S. 252 (1977). A similar motion was granted in United States v. Gustavo Carrillo-Lopez, No. 3:20-cr-00026-MMD-WGC (D. Nev. Aug. 18, 2021)

The reasons in support are fully addressed in the attached Memorandum in Support.

Respectfully submitted,

S/ David L. Doughten
David L. Doughten
4403 St. Clair Ave.
Cleveland, OH 44103
(216) 361-1112
(216) 881-3928 Fax
ddoughten@yahoo.com

Attorney for Defendant

**CERTIFICATE OF SERVICE**

I hereby certify that on the 30th day of September, 2021, a copy of the foregoing was filed electronically. Parties may access this filing through the Court's system. Notice of this filing will be sent by operation of the Court's electronic filing system

S/ David L. Doughten
David L. Doughten

Attorney for Defendant

**MEMORANDUM IN SUPPORT**

A federal grand jury indicted the defendant Willie Antonio Samuel-Baldayaquez on February 5, 2020 for one count of Illegal Reentry, 8 USC §1326. The defendant requests that this count be dismissed due to its unconstitutional application as Section 1326 violates the Equal Protection Clause of the Fifth Amendment. As noted previously, the district court in Nevada found that the statute violated this clause. It does not appear that this circuit has yet directly addressed this issue. However, recent Supreme Court decisions support the opinion of the Nevada district court.

In April 2020, the Supreme Court relied on historical evidence of a state legislature's racial motives to strike down a criminal law enacted a century earlier. *See Ramos v. Louisiana*, 140 S. Ct. 1390, 206 L. Ed. 583 (2020). The case directly addressed the right to unanimous verdicts. The Court noted that with the Louisiana law, that "the avowed purpose of the law was to 'establish the superiority of the white race,' and that the resulting document included many of the trappings of the Jim Crow era: a poll tax, a combined literacy and property ownership test, and a grandfather clause that in practice exempted most white residence from the most onerous of these requirements." *Id*. 1394.

Although the law was later reenacted with no evidence of animus, the Court refused to ignore the "racially discriminatory *reasons* that [the state] adopted [its] peculiar rules in the first place." *Id.* at 1401 (emphasis in original). Even the justices' "shared respect for rational and civil discourse" could not "supply an excuse for leaving an uncomfortable past unexamined." *Id*. at 1401 n.44.

Like the law in *Ramos*, the law criminalizing illegal reentry into the United States at 8

U.S.C. § 1326 has an "uncomfortable past" that must be examined. *Id.* Enacted at the height of the eugenics movement, the "Undesirable Aliens Act of 1929" was conceived, drafted, and enacted by white supremacists out of a belief that the "Mexican race"[1] would destroy the racial purity of the United States. Legislators referred to Mexicans as "mongrels" and "peons."[2] They claimed Mexicans were "poisoning the American citizen." *(Id*. p. 8, 10, 11, 12, 13, 17). They sought to keep the country's blood "white and purely Caucasian." (Id. at 13) They solicited reports and testimony from a eugenicist who likened immigration policy to the "breed[ing] of thoroughbred horses."(Id.) Not only did this racism underlie the original version of § 1326, the law has disparately impacted Mexicans and other Latinx individuals in the century since.

Because the facts and historical evidence presented here show that the original illegal reentry law was enacted with a discriminatory purpose and still has a disparate impact, § 1326 is presumptively unconstitutional under *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977). The burden thus shifts to the government to show that Congress would have passed the 1929 law in the absence of any discriminatory purpose. If the government cannot make this showing, the law is invalid, and the Court must dismiss Mr. Samuel-Baldayaquez's criminal charge.

**II. ARGUMENT**

**A. Legal framework**

The Fifth Amendment of the Constitution provides that no person shall be "deprived of

---

[1] Mexican was listed as a "Color or Race" in the 1930 United States Census. www.census.gov/history

[2] Immigration and Language Rights: *The Evolution of Private Racist Attitudes into the American Public Law and Policy*, 7 Nev. L.J. 895, 913 (2007).

life, liberty, or property, without due process of law." U.S. Const. amend. V. This clause contains an implicit guarantee of equal protection in federal laws identical to what the Fourteenth Amendment guarantees in state laws. *See Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1686 n.1 (2017).

A law may violate equal protection in three ways. First, a law may discriminate on its face. *See*, *e.g.*, *Loving v. Virginia*, 388 U.S. 1 (1967). Second, authorities may apply a facially neutral law in a discriminatory way. *See*, *e.g.*, *Yick Wo v. Hopkins*, 118 U.S. 356 (1886). Third, a legislature may enact a facially neutral law with a discriminatory purpose, which disparately impacts a disfavored group. *See*, *e.g.*, *Arlington Heights*, 429 U.S. at 265–68.

Here, Samuel-Baldayaquez challenges § 1326 only under the third rationale, so the legal framework of *Arlington Heights* applies. *Arlington Heights* clarified that the *effect* of a racially discriminatory law does not alone make it unconstitutional—challengers must also show "[p]roof of racially discriminatory *intent* or *purpose*" at the time of the law's passage. *Id*. at 265 (emphasis added). Determining whether a purpose was discriminatory requires "a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Id*. at 266. *Arlington Heights* gave a non-exhaustive list of relevant factors to consider in this determination, including:

1) the impact of the official action and whether it bears more heavily on one race than another;

2) the historical background of the decision;

3) the specific sequence of events leading to the challenged action;

4) the [legislature's] departures from normal procedures or substantive conclusions; and,

5) the relevant legislative or administrative history.

*Arce v. Douglas*, 793 F.3d 968, 977 (9th Cir. 2015) (citing *Arlington Heights*, 429 U.S. at 266–68).

The threshold for satisfying these factors is low. Since legislatures are rarely "motivated solely by a single concern," a challenger need not show that the legislature's actions "rested solely on racially discriminatory purposes." *Arlington Heights*, 429 U.S. at 265–66. Instead, the challenger need only show "proof that a discriminatory purpose has been a *motivating factor* in the decision." *Id.* at 265–66 (emphasis added). *See also Arce*, 793 F.3d at 977 (quoting *Arlington Heights* to hold that a challenger need not prove discrimination was the "sole purpose" of the challenged action—only that it was a "'motivating factor'").

**1. Non-Citizens Afforded Fifth Amendment Protection**

As an initial matter, the Supreme Court has held that greater protections under the Fifth Amendment necessarily apply when the government seeks to "punish[] by deprivation of liberty and property." *Wong Wing v. United States,* 163 U.S. 228, 237 (1896) ("[E]ven aliens shall not be held to answer for a capital or other infamous crime, unless on a presentment or indictment of a grand jury, nor be deprived of life, liberty, or property without due process of law."). There is no precedent that a criminal law enacted by Congress is free from constitutional equal protection constraints, even if the offense relates to immigration. Thus, the defendant Samuel-Baldayaquez, who is from the Dominican Republic, is protected.

The federal government's plenary power over immigration does not give it license to enact racially discriminatory statutes in violation of equal protection. Therefore, once the challenger shows that discriminatory purpose was a "motivating factor," the burden shifts to the

law's defender to show that "the same decision would have resulted even had the impermissible purpose not been considered." *Arlington Heights*, 429 U.S. at 270 n.21. *See also Hunter v. Underwood*, 471 U.S. 222, 228 (1985) (if racial discrimination was a motivating factor, "the burden shifts to the law's defenders to demonstrate that the law would have been enacted without this factor."). If the government cannot show that the legislature would have enacted the offending law in the "absence of the racially discriminatory motivation," the law violates the Fifth Amendment and must be invalidated. *Id*. at 225.

Courts have applied *Arlington Heights* to a variety of laws and government actions. One of the first involved a provision in the Alabama constitution that barred voting for any person convicted of a "crime involving moral turpitude." *Hunter*, 471 U.S. at 222. Though neutral on its face, the provision disenfranchised ten times as many blacks as whites. *Id.* at 227. To prove discriminatory intent in its passage, challengers submitted transcripts of the 1901 Alabama constitutional convention where lawmakers had originally enacted the provision, as well as several historical studies and the testimony of two expert historians. *See id.* at 229. This evidence showed that "zeal for white supremacy ran rampant" at the 1901 convention and was a "motivating factor" underlying the voting provision. *Id*. at 229–31. And because the provision "would not have been adopted by the convention or ratified by the electorate in the absence of the racially discriminatory motivation," the Supreme Court held that it violated equal protection. *Id*. at 231.

As an example, relatively recently, an en banc panel of the Ninth District Court of Appeals applied *Arlington Heights* in the context of the Voting Rights Act to strike down a state law criminalizing third-party ballot collection. *See Democratic Nat'l Comm. v. Hobbs*, 948 F.3d

989 (9th Cir. 2020) (en banc). The Court looked to the law's legislative history and the events leading up to its passage, including a "racially tinged" video made by the chairman of the county's Republican party that was widely distributed on social media. *Id*. at 1009. It also considered "unfounded and often farfetched allegations" of ballot collection fraud by a state senator who was "one of the major proponents" of the law and "influential in" its passage. *Id*. at 1009, 1039 (quotations omitted). While the Court found that some lawmakers had voted in favor of the law due to a "sincere, though mistaken, non-race-based belief" in voting misconduct, it concluded that this belief was "fraudulently created" by the senator's misrepresentations and the "racially tinged" video. *Id*. at 1040. Citing the "'cat's paw' doctrine," —which holds that even the votes of "well meaning legislators" can contain a discriminatory intent if based on "false and race-based allegations" of other legislators—the Court invalidated the law. *Id*. at 1041.

**B. Racially tinged history of §1326**

In the early 1920s, Congress began to focus its legislation around the exclusion of "undesirable" immigrants—which was often code for non-white. *See Ave. 6E Investments, LLC v. City of Yuma, Ariz.*, 818 F.3d 493, 505–06 (9th Cir. 2016) (holding that "the use of 'code words' may demonstrate discriminatory intent"). The first such law was the National Origins Act of 1924, which established quotas based on the national origins of U.S. citizens as reflected in the 1920 census.

The quotas created by the National Origins Act were skewed to keep the nation's "racial strains" predominantly Anglo-Saxon.[3] The law on its face did not count "nonwhite people residing in the United States" toward the quotas it established. Indeed, its newly-created "Quota

[3] Mae M. Ngai, Impossible Subjects, 24-25 (2004 William Chafe, et al)

Board" interpreted this provision to exclude all Black people; all East and South Asians (including those who had American citizenship by birth); and all citizens in Hawaii, Puerto Rico, and Alaska. Congress and the president accepted these exclusions under pressure to "stand firm against the efforts of 'hyphenates' who would 'play politics with the nation's blood stream.'"[4]

At that time, 1929, much of the attitude behind the reentry law was based on eugenics. At the center of the eugenics movement was Dr. Harry H. Laughlin, the director of the Eugenics Record Office. Dr. Laughlin was well known for his model sterilization law that many states and countries, including the Third Reich of Nazi Germany, used as a template. During the 1920s, Dr. Laughlin testified before Congress multiple times and produced four reports that discussed topics such as "race crossing," "mate selection," "fecundity," "racial composition," and the "individual quality of future population." *The Eugenical Aspects of Deportation: Hearings before the Committee on Immigration and Naturalization House of Representative*, 70th Cong. 70.1.4 , pp. 2, 3 (1928). Relying heavily on these theories, Congress would anchor its immigration legislation in eugenics and racial inferiority for the remainder of the decade, if not much longer.

**C.    The Act of 1929 was first enacted with a racially discriminatory purpose.**

In *Carrillo-Lopez*, the government ultimately conceded that discriminatory intent motivated the passage of the Act of 1929. But because the background of the Act of 1929 is relevant to the eventual passage of Section 1326 in 1952, and because the 1952 Congress adopts language from the Act of 1929 almost word for word, the Court will address each of the proffered *Arlington Heights* factors as they relate to the 1929 statute. The Court concludes, as did both parties, that *Carrillo-Lopez* presents sufficient evidence to demonstrate the Act of 1929

---

[4] Ngai, supra at 26, 35.

was motivated by racial animus.

**a. Historical Background**

*Arlington Heights* permits courts to consider "the historical background of the decision." 429 U.S. at 265-68. *Carrillo-Lopez* explained how immigration legislation and racism were intimately entwined in the 1920s. The court found that Kelly Lytle Hernández, Professor of History at the University of California, Los Angeles, gave context to that history through a sworn declaration in which she testifies that "the criminalization of unauthorized entry was a racially motivated act." (Exhibit A, Hernandez Declaration, p. 49). The Act of 1929 came on the heels of the National Origins Act of 1924 which "narrow[ed] the pathways of legal immigration" by reserving 96 percent of all quota slots for European immigrants. (Exhibit A, Hernandez Declaration, at 4.) But the National Origins Act exempted immigrants from the Western Hemisphere, in part due to pressures from American industry who relied on Mexican labor. (*Id.*)

Nativists and proponents of eugenics argued against this exemption. Professor Hernández emphasized how racial animus "bec[am]e more intense" heading into the 1920s, a period referred to as the "Tribal Twenties," when nativism and eugenics became more widely accepted and began to impact Congressional immigration proposals. (Carrillo-Lopez Hearing, at 27-28; Exhibit A, Hernandez Declaration, at 5. ("[T]he Nativists in Congress never gave up their quest to end Mexican immigration to the United States. After the passage of the 1924 Immigration Act, they proposed bill after bill attempting to add Mexico to the quota system. Between 1926 and 1930, Congress repeatedly debated the future of Mexican immigration into the United States.").

Additionally, and among other things, Professor Hernández addressed the "Juan Crow regime" that developed in the 1920s, "a racialized subjugation system in place that mirrors what

[was] happening in the American South." (Carrillo-Lopez Hearing, at 32.) The aforementioned Mexican exemption in 1924 resulted in a "pretty rapid turn to focusing on getting Mexican immigrants included on the quota," with two major pieces of legislation attempted in 1926 and 1928, but both protested by "major employers and industries across the west" who were "concerned that they w[ould] be cut off from access to Mexican workers."(*Id.* at 28-30.) The court found that while employment lobbies won initially, "the nativists [were] furious in Congress . . . so [sought] to pursue this through other means" which ultimately led to the Act of 1929 which criminalizes unlawful entry and reentry." (*Id.* at 28-29.)

Relatedly, the Court may consider "the relevant legislative or administrative history." 429 U.S. at 265-68. *Carrillo-Lopez* argues that legislative history "easily clears the low threshold of showing that racism and eugenics were a 'motivating factor' .. ." (Hernandez Declaration at 15.) While there was little discussion or debate prior to the Senate's passage of the Act of 1929, the bill was introduced after prior attempts failed. These prior failed attempts clearly indicate racial animus. For example, a House Committee on Immigration and Naturalization hearing on "The Eugenical Aspects of Deportation" included testimony from principal witness Dr. Harry H. Laughlin, a wellknown eugenicist who suggested that "immigration control is the greatest instrument which the Federal Government can use in promoting race conservation of the Nation"(Exhibit 3, Immigration Committee Report, The Eugenical Aspects of Deportation of Feb. 21, 1928 at 11, 19), and compared drafters of deportation laws to "successful breeders of thoroughbred horses" (*Id.* at 44)

**c. Departure from Normal Substantive Considerations**

The next *Arlington Height's* factor a court can consider is "the legislature's departure[]

from normal procedures or substantive conclusions." 429 U.S. at 265-68. The "1920s was the first and only era in which Congress openly relied on the now discredited theory of eugenics to enact immigration legislation," with illegal reentry laws as one of "few laws still in effect from that era." (ECF No. 26 at 16.) Further, the discussions departed from typical conclusions underlying immigration law because the "racial vitriol expressed during the debates was directed almost exclusively at Mexicans—even though Canadians were also entering the United States in record numbers." (*Id.* (citing Exhibit C, CR House 3614, Feb. 16, 1929 at 9.))

Taking these factors into account, the *Carrillo-Lopez* Court was persuaded that the defendant had demonstrated that a racial animus was a strong motivating factor in the passage of the Act of 1929 under the *Arlington Heights* framework. The evidence clearly indicated that the Act of 1929 was passed during a time when nativism and eugenics were widely accepted, both in the country at large and by Congress, and that these racist theories ultimately fueled the Act's passage.

**D. The 1952 reenactment did not cleanse Section 1326 of its racist origins and was also motivated by discriminatory intent.**

The government in *Carrillo-Lopez* argued that reenactment of an existing law in 1952 overcame the improper animus of the 1929 law. But a review of the legislative history of the latter law only reinforces the ill-intent of Congress in this regard. This is because in 1952 Congress not only remained silent, but repeatedly recodified Section 1326 with more punitive measures with knowledge of the law's disparate impact, over a presidential veto addressing the bill's racism, and at a moment in history when Congress was simultaneously passing other legislation disparately impacting Latinx migrants. (Carrillo-Lopez Hearing at 1-2.) Clearly, the racial animus exhibited in the Act of 1929's passage did infect Section 1326's enactment in

1952.

The federal district court in *Carrillo-Lopez* found the evidence that racial animus motivated the Act of 1929 was relevant to the 1952 *Arlington Heights* inquiry in two ways. First, evidence from the 1929 Congress was relevant as historical background for the passage of the INA in 1952. *See Machic-Xiap*, 2021 WL 2021 WL 3362738 at *12 (finding the history of the 1929 statute "strong" historical background evidence). The court incorporated by reference this prior evidence as evidence of the historical background motivating the passage of Section 1326 in 1952.

Second, the *Carrillo-Lopez* Court did not rely solely on the evidence from 1929, but also considered contemporaneous evidence from 1952. In evaluating that evidence, the Court looked at the interplay between legislative history and relevant historical evidence. Specifically, the Court considered:

1. a relative lack of discussion compared to robust Congressional debate regarding other provisions of the INA;

2. explicit, recorded use of the derogatory term "wetback" by supporters of Section 1326;

3. Congressional silence while increasingly making the provision more punitive; Congress' failure to revise in the face of President Truman's veto statement calling for a reimagination of immigration policy;

4. knowledge of the disparate impact of Section 1326 on Mexican and Latinx people;

5. and passage of the so-called "Wetback Bill" by the same Congress only months prior. (Addressed below in this motion)

The *Carrillo-Lopez* Court recognized that the above evidence was circumstantial, and that each instance might not be as probative when considered alone. But in its totality, the cited

evidence was sufficient to demonstrate that racial animus was at least one motivating factor behind the enactment of Section 1326.

**i. Silence Compared to Robust Debate on Other Provisions**

*Carrillo-Lopez* also considered the lack of debate regarding recodification of Section 1326 in 1952, when other provisions of the INA were debated and discussed. Defense expert Professor Gonzalez O'Brien testified that the contrast between extensive congressional debate about other national origin provisions and the comparative lack thereof around Section 1326 suggests an acceptance of its history. (Hearing Transcript at at 181.) Other instances of discriminatory immigration policy, Professor Gonzalez O'Brien notes, prompted the Congress to debate about what was deemed a problematic aspect of the original enactment—including during the 1952 enactment of the (*Id.* at 180.) Professor Gonzalez O'Brien concluded "that's one of the reasons that I'm willing to say that this is a demonstration of racial—of continued racial animus, is that you're acknowledging in the debate over the McCarran-Walter Act, members of Congress are acknowledging that there are problematic racial aspects to the 1924 Johnson-Reed Act, which comes five years before the Undesirable Aliens Act, and yet they choose to not only recodify the 1326, but to recodify it[] without any examination." (*Id*. at 180-81.)

Professor Gonzalez O'Brien's testimony depicts a Congress that was more concerned with which racial and ethnic groups warranted continued discriminatory exclusion, rather than any desire to confront or revise the nativism reflected in the Act of 1929. As a matter of logic, the 1952 Congress could have either examined that history or ignored it. *Carrillo-Lopez* reasoned that if the 1952 Congress ignored the express nativist intent behind the Act of 1929, there would be no reason to assume that the later enactment arose from some wholly unrelated

motivation cleansed from discriminatory intent.

If Congress did not ignore the Act of 1929's history, there was opportunity to either adopt its racial animus or refute its improper motivation and clarify a purpose for the statute that did not violate the Equal Protection Clause. The 1952 Congress remained silent, even when other provisions of the law were being debated. When considered in comparison with the express debate over other racially problematic predecessor statutes, Congress' silence weighed in favor of establishing that Carrillo-Lopez's met his burden.

**ii.     President Truman's Veto**

The Court also considered that Congress declined to comment on the racist forebears of Section 1326, even in the face of President Truman's veto of the INA. On June 25, 1952, President Truman vetoed INA, and included a veto statement. (Exhibit A) President Truman condemned the INA as "legislation which would perpetuate injustices of long standing against many other nations of the world" and "intensify the repressive and inhumane aspects of our immigration procedures." (*Id.* at 3.) Finding that the positive aspects of the INA were "heavily outweighed" by other provisions, President Truman expressed dismay that so much of the INA "would continue, practically without change" discriminatory practices first enacted in 1924 and 1929. (*Id.* at 4.)

Nevertheless, Congress overrode President Truman's veto and passed the INA. (*Id.*) Carrillo-Lopez argued that Congress' decision to pass the INA over a presidential veto that "explicitly called out the law for its racism" is evidence of racial animus. (Exhibit A at 5-6.) While President Truman did not explicitly address racism as to Mexican or Latinx individuals, he commented on the negative implications of expanding the grounds for deportation, and

implored Congress to reconsider the INA's passage: "Should we not undertake a reassessment of our immigration policies and practices in the light of the conditions that face us in the second half of the twentieth century? . . . I hope the Congress will agree to a careful reexamination of this entire matter." (Exhibit A, President Truman Veto Bill, at 10.) President Truman clearly wanted Congress to review the INA and reconsider its objectives. This was done by Congress despite the President's urging.

**iii. "Wetback Bill"**

*Carrillo-Lopez* further considered the passage of the so-called "Wetback Bill" as evidence of historical background. The bill's passage is particularly probative because it was "passed by the same congress during the same time frame and with the same express aim as illegal reentry . . ." (Exhibit D, Brief on McClaran Act, at 10.) Senate Bill 1851, nicknamed the "Wetback Bill," was passed March 20, 1952, just a few months before the INA. *See* United Statutes at Large, 82 Cong. ch. 108, 66 Stat. 26 (March 20, 1952). The bill's stated aim was to "assist in preventing aliens from entering or remaining in the United States illegally." *Id.* The resultant was reflective of Congress' racially motivated bill. That bill specifically targeted those of Hispanic heritage, Latin America in particular.

The unfortunate history of §1326 is really not under dispute. The Government's only contra argument has to be that even if the original enactment of the statute was at least partially racially motivated, the statute is not currently being enforced in a discriminatory fashion. This may or may not be true. But the current enforcement policy is a non-consideration under *Arlington Heights*.

**Conclusion**

Because 8 U.S.C. 1326 would not have be enacted absent racial animus it violates the equal protection guarantee of the Fifth Amendment under the standard of *Village of Arlington Heights v. Metropolitan Housing Development Cor*p., 429 U.S. 252 (1977), the charges here must be dismissed. It is irrelevant that Carrillo-Lopez was Mexican and the defendant here is Dominican. The law itself must fall as it was enacted with a discriminatory purpose.

                                          Respectfully submitted,

                                           S/ David L. Doughten
                                          David L. Doughten

                                          Attorney for Defendant