IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.: 4:20CR83 |
| | ) | |
| Plaintiff, | ) | JUDGE DONALD C. NUGENT |
| | ) | |
| v. | ) | |
| | ) | |
| WILLIE ANTONIO SAMUEL-BALDAYAQUEZ, | ) | RESPONSE IN OPPOSITION TO MOTION TO DISMISS |
| | ) | |
| Defendant. | ) | |

Now comes the United States of America, by and through counsel, Bridget M. Brennan,

Acting United States Attorney, and Jason W. White, Special Assistant United States Attorney,

and files this Response in Opposition to the defendant's Motion to Dismiss Indictment (ECF No.

17). For the following reasons, the motion should be denied.

## FACTUAL BACKGROUND

The defendant, WILLIE ANTONIO SAMUEL-BALDAYAQUEZ, was born in the

Dominican Republic in 1982 and is and has been always, a citizen of the Dominican Republic.

At an unknown location and on an unknown date, SAMUEL-BALDAYAQUEZ entered the

United States without inspection by a United States immigration officer after previously being

removed leading to the present case before the Court.

On November 13, 2008, an Immigration Judge ordered SAMUEL-BALDAYAQUEZ to

be removed from the United States after he entered the country on July 2, 1995. On January 30,

2009, SAMUEL-BALDAYAQUEZ departed the United States by plane at New York, New

York to the Dominican Republic.

On June 15, 2011, SAMUEL-BALDAYAQUEZ was again found in the United States and determined to be subject to removal through reinstatement of the prior removal order. A warrant of removal was issued on December 6, 2011.

On July 12, 2012, a federal grand jury in the District of Connecticut filed an indictment charging SAMUEL-BALDAYAQUEZ with violating 8 U.S.C. § 1326(a), Illegal Reentry. After SAMUEL-BALDAYAQUEZ pleaded guilty to the single-count indictment, a federal judge sentenced SAMUEL-BALDAYAQUEZ to serve twelve months and one day of incarceration on February 28, 2013. On June 20, 2013 and July 1, 2013, additional warrants of removal were issued. On July 16, 2013, SAMUEL-BALDAYAQUEZ once again departed the United States pursuant to a removal order from New Orleans, Louisiana to the Dominican Republic.

In July 2019, members of the United States Customs and Border Patrol, Federal Bureau of Investigation, and the Ohio Bureau of Investigation initiated an investigation into the use of fraudulent identification documents to steal motor vehicles and watercraft. Investigators identified SAMUEL-BALDAYAQUEZ as a target of that investigation and learned that SAMUEL-BALDAYAQUEZ was incarcerated in Watertown, Connecticut charged with Identity Theft, Conspiracy to Commit Larceny in the First Degree, and Interfering with an Officer.

On February 5, 2020, a federal grand jury in the Northern District of Ohio filed an indictment charging SAMUEL-BALDAYAQUEZ with one count of Illegal Reentry in violation of 8 U.S.C. § 1326, commencing the instant case. On October 15, 2020, a writ of habeas corpus ad prosequendum was issued in this Court and SAMUEL-BALDAYAQUEZ was subsequently transferred to the Northern District of Ohio.

SAMUEL-BALDAYAQUEZ is also named in a superseding indictment filed on September 3, 2020 in this district charging him with Conspiracy to Commit Bank Fraud, Bank Fraud, and Aggravated Identity Theft.

## ARGUMENT

The principal thrust of the defendant's argument is that Congress's 1929 enactment of a statute criminalizing illegal reentry was tainted by improper motives, and that this original discriminatory intent renders any subsequent congressional immigration legislation unconstitutional, up to and including the present-day version of 8 U.S.C. § 1326, which was first enacted in 1952.  Because the defendant's attempt to definitively discern the various motives of the 500-plus members of the 70th Congress who voted on the 1929 statute conflicts with Supreme Court guidance barring such speculation, and because Congress possesses plenary power to enact exactly this type of immigration legislation (in 1929, in 1952, and today), the defendant's argument fails at the threshold.

More fundamentally, because the 1929 law has been replaced, the defendant's only argument—that Congress's allegedly impermissible motive in 1929 forever taints subsequent illegal reentry laws—fails.  Even assuming Congress's 1929 illegal reentry law was wholly the result of impermissible racial animus, well-established doctrine holds that such legislative history would have no bearing on the law Congress subsequently enacted in 1952.  The defendant does not even attempt to argue that § 1326, as first enacted in 1952 and amended many times over, was the product of similar animus.  As explained below, these omissions doom the defendant's motion.

**A.      Statutory background**

The immigration of foreign nationals to the United States was unrestricted until 1875. *See Kleindienst v. Mandel*, 408 U.S. 753, 761 (1972); see also *Harisiades v. Shaughnessy*, 342 U.S. 580, 588 n.15 (1952). In 1882, Congress passed the first general immigration statute. *Id.* Several other statutes quickly followed, *see id.*, and in 1917, Congress passed legislation requiring deportation of certain aliens who entered the United States "at any time or place other than as designated by immigration officials, . . . or who enter[ed] without inspection." Immigration Act of 1917, Pub. L. No. 64-301, § 19, 39 Stat. 874, 889. The 1917 law, however, contained no penalty, other than repeated deportation, for reentering the United States after removal. Accordingly, to enhance the deterrent value of our immigration laws, the 70th Congress made reentry after deportation a felony offense punishable by up to two years of imprisonment. *See* Act of Mar. 4, 1929, Pub. L. No. 70-1018; see also *United States v. Corrales-Vazquez*, 931 F.3d 944, 947 (9th Cir. 2019) ("In 1929, Congress decided that aliens who 'enter the United States surreptitiously' should be subject to not only deportation but also criminal penalties, and revised the prohibitions in the 1917 statute[.]"). The Senate Report from the Committee on Immigration outlined the purpose of the law thusly:

> Except [for "members of the anarchistic and similar classes"] . . . there is no provision of law under which a penalty, other than repeated deportation, can be imposed on aliens who have been expelled from the United States and who reenter the country unlawfully. It frequently happens that aliens of the criminal and other classes who are deported under the general immigration law reenter the country unlawfully. As a matter of fact, in some instances such aliens have been deported four or five times, only to return as soon as possible to the United States in an unlawful manner.

S. Rep. No. 70-1456, at 1 (Jan. 17, 1929). The report then set out the parameters of the proposed illegal reentry crime, positing that "[i]t is believed that such a statute would be of material aid in enforcing our immigration laws." *Id.*

The Secretary of the Department of Labor—charged at that time with enforcing the country's immigration laws—agreed.  In a letter included in the Senate Report, the Secretary stated that the proposed law "would be of material assistance in the administration of existing immigration laws."  Continuing, the Secretary noted as follows:

> It is academic that no prohibitive law can successfully be enforced without a deterrent penalty.  The fact that possible deportation is not a sufficient deterrent to discourage those who seek to gain entry through other than regular channels is demonstrated by the frequency with which this department is compelled to resort to deportation proceedings for the same alien on several succeeding occasions. . . . Aside from the sexual immoral and members of the anarchic and similar cases there is nothing in the immigration laws which penalizes aliens for reentering the United States unlawfully after they have been deported at considerable expense to the Government.  The enactment of a law imposing a penalty is recommended.

*Id.*

Over twenty years later, in 1952, the 82nd Congress passed the Immigration and Nationality Act ("INA"), an act designed to "revise the laws relating to immigration, naturalization, and nationality" in the United States.  *See* Pub. L. No. 82-414, 66 Stat. 163 (introduction); *see also E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 756 (9th Cir. 2018) ("In 1952, Congress replaced this disparate statutory scheme with the Immigration and Nationality Act ("INA"), which remains the governing statutory framework."); *City & Cty. of San Francisco v. United States Citizenship & Immigration Servs.*, 944 F.3d 773, 795 (9th Cir. 2019) ("Congress substantially revised the immigration laws in the Immigration and Nationality Act of 1952.").  In this renewed and comprehensive legislation (codified at 8 U.S.C. § 1 et seq.), Congress passed another crime for reentry of a deported alien.  The text provided as follows:

> Any alien who (1) has been arrested and deported or excluded and deported, and thereafter (2) enters, attempts to enter, or is at any time found in, the United States, unless (A) prior to his reembarkation at a place outside the United States or his application for admission from foreign contiguous territory, the Attorney General has expressly consented to such alien's reapplying for admission; or (B) with respect to an alien previously excluded and deported, unless such alien shall

> establish that he was not required to obtain such advance consent under this or any prior Act, shall be guilty of a felony[.]

*Id.* at § 276, 66 Stat. 229.  And thus 8 U.S.C. § 1326 was born.

Over the years, Congress has updated § 1326 multiple times—and always to increase its deterrent value.  For instance, in the Anti-Drug Abuse Act of 1988, the 100th Congress added subsection (b) to § 1326, creating enhanced penalties for aliens with prior felony convictions. *See* Pub. L. No. 100-690, § 7345, 102 Stat. 4181; see also *United States v. Maul-Valverde*, 10 F.3d 544, 545 (8th Cir. 1993) ("Congress enacted 8 U.S.C. § 1326(b) in 1988 to substantially increase the criminal penalty if an illegally reentering alien was previously deported following a felony conviction.").  Other modifications occurred in the Immigration Act of 1990, Pub. L. No. 101-649, 104 Stat. 4978 (increasing the fine provision); the Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, 108 Stat. 1796 (increasing penalties); the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 (among other things, limiting collateral attacks on deportation orders in § 1326 prosecutions); and the Omnibus Consolidated Appropriations Act of 1997, Pub. L. No. 104-208, 110 Stat. 3009 (among other modifications, striking "arrested and deported, has been excluded and deported," and inserting "denied admission, excluded, deported, or removed").

Congress's continual strengthening of § 1326's deterrent value "suggests a crystallizing vision on Congress's part of the need for stern punishment in this milieu." *United States v. Dwinells*, 508 F.3d 63, 69 (1st Cir. 2007); *see also United States v. Shill*, 740 F.3d 1347, 1352 & n.5 (9th Cir. 2014).  With this statutory backdrop in mind, the government next addresses the merits of the defendant's argument.

**B.      The defendant fails to establish an equal protection violation.**

The Court should deny the defendant's motion to dismiss for at least three reasons. First, immigration laws are subject to a highly deferential standard of review, a standard that the defendant fails to meet here. Section 1326 bears an undeniably rational relationship to the government's legitimate interest in enforcing its immigration laws. It therefore passes with ease even ordinary rational-basis review. Second, in the highly deferential context of immigration legislation, courts are not permitted to probe the alleged motives of those who passed the challenged law. And finally, even if courts were free to look behind an immigration law's clearly valid purpose, the defendant's challenge to § 1326 would nonetheless fail because it focuses entirely on the legislative motives of the 1929 Congress, not the Congress that actually passed, or repeatedly amended, § 1326.

Indeed, one district judge in the Eastern District of Virginia has squarely rejected the defendant's argument. *See United States v. Palacios Arias*, No. 3:20-cr-62-JAG, ECF No. 37 at 6 n.7 (E.D. Va. Oct. 13, 2020) ("Even assuming, however, that the Court can consider the discriminatory purpose that the defendant alleges motivated Congress to pass the Undesirable Aliens Act of 1929, this evidence has only marginal relevance to the defendant's challenge to the INA, passed by Congress twenty-three years later.").

### 1. Congress's immigration laws are subject to deferential rational-basis review.

Congress's legislative power in the arena of immigration law is plenary: "'[O]ver no conceivable subject is the legislative power of Congress more complete than it is over' the admission of aliens." *United States v. Gonzales-Vela*, 276 F.3d 763, 767 (6th Cir. 2001) (quoting *Fiallo v. Bell*, 430 U.S. 787, 792 (1977)). Given Congress's expansive authority over immigration affairs, its actions in this area are "largely immune from judicial control," *Fiallo*, 430 U.S. at 792, subject only to "narrow judicial review," *Hampton v. Mow Sun Wong*, 426 U.S.

88, 102 n.21 (1976); see also *Mathews v. Diaz*, 426 U.S. 67, 82 (1976) (describing the "narrow standard of [judicial] review of decisions made by the Congress or the President in the area of immigration and naturalization").  Indeed, "the reasons that preclude judicial review of political questions also dictate a narrow standard of review of decisions made by the Congress or the President in the area of immigration and naturalization."  *Fiallo*, 430 U.S. at 796 (citing *Mathews*, 426 U.S. at 82); see also *id.* at 792 ("[I]t is important to underscore the limited scope of judicial inquiry into immigration legislation.").  This judicial deference applies equally to constitutional questions.  *See Othi v. Holder*, 734 F.3d 259, 269 (4th Cir. 2013) ("[N]oting the extraordinarily deferential standard of review that applies in this [immigration] context, even as to constitutional questions.").  The Sixth Circuit has held that courts must uphold immigration statutes as long as they are "conceivably related to the achievement of a federal interest." *Bangura v. Hansen*, 434 F.3d 487, 495 (6th Cir. 2006) (citing *Almario v. Attorney General*, 872 F.2d 147, 152 (6th Cir. 1989)) (denying equal protection claim that involved the "fundamental right" to marry).  These longstanding principles were recently reaffirmed by the Supreme Court. *See, e.g., Trump v. Hawaii*, 138 S. Ct. 2392, 2419 (2018) ("[O]ur opinions have reaffirmed and applied [this] deferential standard of review across different contexts and constitutional claims.").

Under governing Supreme Court doctrine, this "deferential standard of review" is limited to considering whether the challenged law is "facially legitimate and bona fide." *Mandel*, 408 U.S. at 769.  In *Mandel*, the Attorney General denied admission to a Belgian journalist who had been invited to speak at a conference at Stanford.  408 U.S. at 756–57.  The professors who wished to hear the journalist challenged that decision under the First Amendment.  *Id*. at 764–65. Although the Supreme Court acknowledged that the challengers' constitutional "right to receive

information" was implicated, it nonetheless limited its review to whether the Executive gave a "facially legitimate and bona fide" reason for its action.  *Id*. at 764–65, 769.  Given the authority of the political branches over admission, the Court held that "when the Executive exercises this [delegated] power negatively on the basis of a facially legitimate and bona fide reason, the courts will neither look behind the exercise of that discretion, nor test it by balancing its justification" against the asserted constitutional interests of U.S. citizens.  *Id*. at 770.  And, in holding as such, the Court declined Justice Marshall's invitation in dissent to take "[e]ven the briefest peek behind the Attorney General's reason for refusing a waiver," which he asserted was a "sham." *Id*. at 778 (Marshall, J., dissenting).  The Supreme Court continues to apply *Mandel*'s instruction. *See Kerry v. Din*, 135 S. Ct. 2128, 2141 (2015) ("*Mandel* instructs us not to 'look behind' the Government's exclusion of" the alien); see also *Morfin v. Tillerson*, 851 F.3d 710, 713 (7th Cir. 2017) (Din "left things as *Mandel* had left them," and "*Mandel* tells us not to go behind a facially legitimate and bona fide explanation").

The Supreme Court later confirmed that *Mandel*'s deferential test applies equally to congressional decision-making.  In *Fiallo*, the Supreme Court considered a congressional law giving immigration preferences to mothers of illegitimate children.  430 U.S. at 795.  In other words, the state created a "categorical" entry classification that discriminated on the basis of sex and legitimacy.  In reviewing an equal protection challenge alleging discrimination against fathers, the Supreme Court found "no reason to review the broad congressional policy choice at issue . . . under a more exacting standard than was applied in . . . *Mandel*, a First Amendment case."  *Id*. at 795.  In rejecting the constitutional challenge, the Court remarked that the issue was one "solely for the responsibility of the Congress and wholly outside the power of this Court to control."  *Id*. at 799.  The Court also made clear that it was "not the judicial role in [immigration

cases] to probe and test the justifications for the legislative decision." *Id.*; see also *Hawaii*, 138 S. Ct. at 2419 (citing *Fiallo's* principle that the judiciary is not to probe the justifications underlying Congress's immigration decisions).

The Supreme Court and the Sixth Circuit continue to apply rational basis review to immigration related challenges, *Hawaii*, 138 S. Ct. at 2420, and recently described that standard as one providing for "minimal scrutiny." *Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1693 (2017). In the Sixth Circuit, *Mandel* and *Fiallo's* "facially legitimate and bona fide" test requires courts to apply rational basis review when considering matters of immigration and naturalization. *Hussein v. Beecroft,* 782 Fed.Appx. 437, 439 (6th Cir. 2019). Under rational basis scrutiny, a statute is "accorded a strong presumption of validity" and will be upheld if "any reasonably conceivable state of facts" could demonstrate that the statute is rationally related to a legitimate government purpose. *Ashki v. INS*, 233 F.3d 913, 920 (6th Cir. 2000) citing *Heller v. Doe*, 509 U.S. 312, 319–20 (1993).

### 2.     Section 1326 easily satisfies even ordinary rational-basis review.

The rational-basis test only requires the Court to "find that the government has employed means that are reasonably related to its policy objective. *Aguila-Cisneros v. INS,* 5 Fed.Appx. 415, 417-184 (6th Cir. 2001) citing *Wright v. MetroHealth Medical Center*, 58 F.3d 1130, 1135 (6th Cir.1995). The test is met where "there is a rational relationship between the disparity of treatment and some legitimate governmental purpose." *Heller v. Doe*, 509 U.S. 312, 320 (1993). The government "has no obligation to produce evidence to sustain the rationality of a statutory classification." *Id.* Instead, the "burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it[.]" *Id.*

10

The government has a legitimate interest in deterring illegal reentry into the United States.  The relationship between that interest and § 1326—which provides sanctions for repeated violations of United States immigration law—is clear.  It is also beyond rational. *See, e.g., United States v. Hernandez-Guerrero*, 147 F.3d 1075, 1078 (9th Cir. 1998) ("[I]t is plain that § 1326 is a necessary piece of the immigration-regulation framework; without the threat of criminal prosecution that it provides, Congress's immigration-regulation authority would be fatally undermined—all bark and no bite."); *United States v. Henry*, 111 F.3d 111, 114 (11th Cir. 1997) ("Section 1326 is not based upon any common law crime but is a regulatory statute enacted to assist in the control of unlawful immigration by aliens."); *United States v. Cupa-Guillen*, 34 F.3d 860, 863 (9th Cir. 1994) ("[T]here is a strong societal interest in controlling immigration and in effectively policing our borders.  This interest is furthered by enhancing punishment against persons who illegally enter the country after having previously committed aggravated felonies."); *United States v. Barron-Rivera*, 922 F.2d 549, 555 (9th Cir. 1991) ("8 U.S.C. § 1326 is designed to effectively enforce the immigration laws").

Because § 1326's purpose is plainly legitimate and inextricably linked to the government's undeniable interest in enforcing its immigration laws, the statute easily passes that "minimal [form of] scrutiny," *Morales-Santana*, 137 S. Ct. at 1693, known as rational basis review.  As noted above, under rational basis review the government has no obligation to produce evidence to sustain the rationality of the challenged law. *See Heller*, 509 U.S. at 320.  To the contrary, the burden of negation lies with the challenger. *See id.*  Here, however, the defendant has failed to even attempt such a showing.  As such, his challenge to § 1326 fails under rational basis review.  *See In Re: City of Detroit et al v. Detroit Water and Sewerage Department*, 841 F.3d 684, 702 (6th Cir. 2016).  This would be true with regards to ordinary

statutes, but is especially so with regards to § 1326, a statute deriving from Congress's plenary immigration powers.

Consider, for example, the District Court for the Southern District of Ohio's reliance on the Fourth Circuit's decision in *United States v. Carpio-Leon*, 701 F.3d 974 (4th Cir. 2012). *United States v. Cordoba,* No. 3:15-CR-067, 2015 WL 6680890 (S.D. Ohio Oct. 30, 2015). In *Cordoba and Carpio-Leon*, the courts considered whether 18 U.S.C. § 922(g)(5), a criminal statute barring aliens from possessing firearms, violated the defendant's Second Amendment and Fifth Amendment equal protection rights. In rejecting the defendant's Second Amendment challenge, the Fourth Circuit noted as follows in *Carpio-Leon*:

> [B]ecause the regulation of aliens' entry into the United States draws on the exercise of national sovereignty, "the responsibility for regulating the relationship between the United States and our alien visitors has been committed to the political branches of the Federal Government." *Mathews v. Diaz*, 426 U.S. 67, 81 (1976). It is well settled that decisions made by the political branches on immigration are subject only to a "narrow standard of review." *Id*. at 82. The Supreme Court, resting on the sovereign aspect of regulating aliens, "has repeatedly emphasized that 'over no conceivable subject is the legislative power of Congress more complete than it is over' the admission of aliens." *Fiallo v. Bell*, 430 U.S. 787, 792 (1977) (quoting *Oceanic Navigation Co. v. Stranahan*, 214 U.S. 320, 339 (1909)).

> Thus, when Congress regulates illegal aliens by prohibiting them from possessing firearms, see 18 U.S.C. § 922(g)(5), it is functioning in a special area of law committed largely to the political branches, see *Shaughnessy*, 345 U.S. at 210, and on which we owe Congress special deference, *Fiallo*, 430 U.S. at 792. Indeed, in addition to making the possession of firearms by illegal aliens a crime, Congress has also made Carpio–Leon's unexamined entry into the United States a crime. *See* 8 U.S.C. § 1325(a); *Plyler v. Doe*, 457 U.S. 202, 219 n.19 (1982) (noting that "entry into the class [of illegal aliens] is itself a crime").

*Id.* at 981-82. In addressing the defendant's equal protection challenge, the court next held thusly:

> Carpio-Leon cannot show that there is no rational relationship between prohibiting illegal aliens from bearing firearms and the legitimate government goal of public safety. To the contrary, courts have identified numerous legitimate reasons why it would be dangerous to permit illegal aliens to arm themselves. . . . More generally,

the Supreme Court has "firmly and repeatedly endorsed the proposition that Congress may make rules as to aliens that would be unacceptable if applied to citizens." *Demore v. Kim*, 538 U.S. 510, 522 (2003).  Congress therefore surely can rationally distinguish between legal aliens and illegal aliens.

*Id.* at 982–83.  Like the statute at issue in *Cordoba* and *Carpio-Leon*, § 1326 derives from that "special area of law" where Congress's power to regulate illegal aliens is at its apex.  *See Abebe v. Mukasey*, 554 F.3d 1203, 1207 n.6 (9th Cir. 2009) ("[F]ederal power is at its zenith" in immigration setting).  And in this context, Congress may legislate in ways that might otherwise be impermissible.  *See Carpio-Leon*, 701 F.3d at 983.  This is so even with respect to criminal statutes.  *Carpio-Leon*, 701 F.3d at 983.  Defendants always bear the burden of demonstrating the absence of a rational relationship between the challenged statute and the government's interest.  And, while special deference is afforded to Congress's legislative decisions in the immigration context, because § 1326 easily passes ordinary rational basis scrutiny, no special deference is needed to reject the defendant's arguments.  *See Tuan Anh Nguyen v. INS*, 533 U.S. 53, 72–73 (2001) ("In light of our holding that there is no equal protection violation, . . .  we need not assess the implications of statements in our earlier cases regarding the wide deference afforded to Congress in the exercise of its immigration and naturalization power.  These arguments would have to be considered, however, were it to be determined that § 1409 did not withstand conventional equal protection scrutiny.).

Here, the government's interest is centuries old.  The Supreme Court recognized as much at least as far back as 1893: "The right to exclude or to expel all aliens, or any class of aliens, absolutely or upon certain conditions, in war or in peace, being an inherent and inalienable right of every sovereign and independent nation, essential to its safety, its independence, and its welfare[.]" *Fong Yue Ting v. United States*, 149 U.S. 698, 711 (1893).  The right of a sovereign to criminally sanction those illegally within its borders is of a similar vintage.  *See Wong Wing v.*

*United States*, 163 U.S. 228, 235 (1896) ("[I]t would be plainly competent for Congress to declare the act of an alien in remaining unlawfully within the United States to be an offence punishable by fine or imprisonment. . . ."). Section 1326 therefore easily comports with rational basis principles.

Of course, the defendant's inability to successfully challenge § 1326 under rational basis review was predictable. As the Supreme Court recently stated, "it should come as no surprise that the Court hardly ever strikes down a policy as illegitimate under rational basis scrutiny." *Hawaii*, 138 S. Ct. at 2420. "On the few occasions where we have done so," the Court continued, "a common thread has been that the laws at issue lack any purpose other than a bare . . . desire to harm a politically unpopular group." *Id.* That is clearly not the case with § 1326—a law seeking to deter all aliens from illegally reentering the country following deportation. The statute's relationship to its goal—one which is at the core of sovereignty, see *Dep't of Homeland Sec. v. Thuraissigiam*, 140 S. Ct. 1959, 1982 (2020) ("The power to admit or exclude aliens is a sovereign prerogative"); *CASA de Maryland, Inc.*, 971 F.3d at 251—is beyond question. And, to the extent this Court needed further proof of the statute's rational relationship to its goal of deterrence and enforcement, this defendant's numerous removals and subsequent reentries—each punctuated by unrelated criminal convictions—is evidence enough. Accord *United States v. Pruess*, 703 F.3d 242, 247 (4th Cir. 2012) (rejecting as-applied equal protection challenge to 18 U.S.C. § 922(g)(1) and noting that "[t]here is a plainly rational relation between the felon-in-possession prohibition as applied to a collector of dangerous, often stolen weapons and explosives who has repeatedly and flagrantly ignored the laws of the United States, … and the legitimate government interest in public safety.").

For the reasons explained above, § 1326 satisfies rational basis review.  The defendant's equal protection claim should therefore be rejected.

### 3.      The defendant's reliance on *Arlington Heights* is misplaced.

Notwithstanding the above, the defendant insists that § 1326 violates equal protection principles due to its predecessor statute's allegedly checkered past.  The defendant's "forever tainted" argument hinges almost exclusively on *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977).  That case, which involved a rezoning request to accommodate the placement of low-income housing, is inapplicable for two reasons.  First, SAMUEL-BALDAYAQUEZ cites only one District Court decision, currently being reviewed by the Ninth Circuit, *United States v. Carrillo-Lopez*, 3:20-cr-00026-MMD-WGC, 2021 WL 3667330 (D. Nev. Aug. 18, 2021) to support his claim that an *Arlington Heights* analysis is appropriate in considering an equal protection challenge to an immigration statute.  However, the Court in *Carrillo-Lopez* ignored the fact that the expansive *Arlington Heights* inquiry is antithetical to the longstanding principle that, with regard to congressional immigration policy, it is "not the judicial role . . . to probe and test the justifications for the legislative decision." *Fiallo*, 430 U.S. at 799; see also *Mandel*, 408 U.S. at 778.  *Arlington Heights* invites inquiry into "circumstantial and direct evidence of intent," the "historical background of the decision," the "specific sequence of events leading up to the challenged decision," and the "legislative or administrative history." 429 U.S. at 267–68.  Such an inquiry cannot be squared with the plenary power given to Congress over immigration policy and the narrow judicial review over such policymaking.  A test drawn from a Supreme Court case involving a local zoning ordinance cannot control judicial review in the highly circumscribed context of immigration legislation. *Accord Hawaii*, 138 S. Ct. at 2420 n.5 (criticizing "the dissent's assumption that courts should

15

review immigration policies . . . under the de novo 'reasonable observer' inquiry applicable to cases involving holiday displays and graduation ceremonies.").

But even if that were not the case—and the Court could, in fact, probe the motives of the legislators who passed the challenged immigration law—the defendant's challenge would still fail. The reason for this is simple. The entirety of the defendant's equal protection argument pivots on the motives of a handful of Congressmen involved in the passing of § 1326's predecessor statute in 1929. Putting aside the fact that "it is extremely difficult for a court to ascertain the motivation, or collection of different motivations, that lie behind a legislative enactment[,]" *Palmer v. Thompson*, 403 U.S. 217, 224 (1971), the defendant's challenge fails because it is levelled at the wrong set of legislative motives.

The governing statutory framework of United States immigration law comes from 1952, when Congress replaced prior disparate statutes with the comprehensive INA. See Pub. L. No. 82-414, 66 Stat. 163 (codified as amended at 8 U.S.C. § 1 et seq.); see also *E. Bay Sanctuary Covenant*, 932 F.3d at 756. Moreover, in addition to enacting § 1326 in 1952, Congress has updated or modified the statute multiple times since, including in 1988, 1990, 1994, 1996, and 1997. Each time Congress did so, it strengthened the law. The defendant has no argument or evidence with regards to these subsequent enactments. Such omissions are fatal to his claim, which, as explained in greater detail below, falters for both factual and conceptual reasons. On the defendant's view, history stopped in 1929. But § 1326 has lived a lengthy and continuously-expanding existence since it was first enacted in 1952. The defendant's exclusive focus on legislators' comments from the 1920s sheds little light on a statute that was conceived in 1952 and has been amended multiple times since. According to the defendant, the taint of prior discriminatory intent forever prevents the criminalization of illegal reentry. But of course,

this makes little sense.  Whether intentional discrimination existed in 1929 legislation is a

question about the motives of the 1929 legislature.  Legislative intent, however, is not an artifact

that "carr[ies] over" from one law to the next.  *See City of Mobile v. Bolden*, 446 U.S. 55, 74

(1980) (plurality opinion) (asking "whether a discriminatory intent has been proved" as to the

particular enactment at issue, because "past discrimination cannot, in the manner of original sin,

condemn governmental action that is not itself unlawful"); *cf. Palmer*, 403 U.S. at 225 ("[T]here

is an element of futility in a judicial attempt to invalidate a law because of the bad motives of its

supporters" because, among other reasons, "it would presumably be valid as soon as the

legislature or relevant governing body repassed it for different reasons").  As the Supreme Court

has put it elsewhere:

> It is entirely a different matter when we are asked to void a statute that is, under
> well-settled criteria, constitutional on its face, on the basis of what fewer than a
> handful of Congressmen said about it.  What motivates one legislator to make a
> speech about a statute is not necessarily what motivates scores of others to enact it,
> and the stakes are sufficiently high for us to eschew guesswork.  We decline to void
> essentially on the ground that it is unwise legislation which Congress had the
> undoubted power to enact and which could be reenacted in its exact form if the
> same or another legislator made a 'wiser' speech about it.

*United States v. O'Brien*, 391 U.S. 367, 384 (1968).

Viewed accordingly, even assuming *Arlington Heights* applies in this case, it would only

get the defendant so far.  First, even when a court finds that prior discrimination was recent,

"[t]he ultimate question" under *Arlington Heights* must be "whether a discriminatory intent has

been proved in [the] given case"—that is, for the particular challenged enactment.  *City of

Mobile*, 446 U.S. at 74 (plurality opinion).  Here, the discriminatory intent cited by the defendant

is neither recent—preceding § 1326 by over two decades—nor proven in the "given case," i.e.

the 1952 statute or any of its subsequent versions.  While it is true that under *Arlington Heights*

"legislative or administrative history may be highly relevant," the Court has specified that this is

especially so "where there are contemporary statements by members of the decision making body[.]" *Arlington Heights*, 429 U.S. at 268 (emphasis added); *see also id.* at 267 (focusing the Court's "historical background" analysis on the "specific sequence of events leading up to the challenged decision").  The Supreme Court's most recent application of *Arlington Heights* bears this out.  *See DHS v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1916 (2020) (plurality opinion) ("[T]hese statements—remote in time and made in unrelated contexts—do not qualify as 'contemporary statements' probative of the decision at issue." (quoting *Arlington Heights*, 429 U.S. at 268)).

Second, even if the Court were to conduct a motive-probing inquiry under *Arlington Heights* and conclude that a discriminatory purpose was a substantial or motivating factor behind the 1929 immigration law's enactment, the burden would then "shift[] to the law's defenders to demonstrate that the law would have been enacted without this factor."  *N. Carolina State Conference of NAACP v. McCrory*, 831 F.3d 204, 221 (4th Cir. 2016).  That burden is easily met here, where the law has a clear rational basis and where the defendant does not even attempt to challenge Congress's 1952 enactment of § 1326 or any of its subsequent modifications.  Indeed, we need not speculate that the law would have been enacted: it was, and several times over.  So, even if we accept the worst about the original Congress that enacted the 1929 legislation—itself a substantial leap—§ 1326 would still not violate the Equal Protection Clause.  Congress's repeated efforts—over the course of multiple decades—to strengthen the law against unlawful reentry underscores the implausibility of the defendant's claim that Congress has been acting out of a discriminatory animus, rather than seeking to address the lasting, and difficult, problem of illegal immigration.

The way in which later congressional enactments undermine the defendant's argument accords with post-*Arlington Heights* cases, which recognize, for example, that the historical background of a decision is one source of evidence of intentional discrimination under *Arlington Heights*, but that "unless historical evidence is reasonably contemporaneous with the challenged decision, it has little probative value." *McCleskey v. Kemp*, 481 U.S. 279, 298 n.20 (1987*); see also id.* ("Although the history of racial discrimination in this country is undeniable, we cannot accept official actions taken long ago as evidence of current intent."). Other post-*Arlington Heights* cases have viewed variants of the "taint argument" with equal skepticism. For example, in *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, the Supreme Court held as follows:

> [P]etitioners note that Proposition 15, the initiative out of which § 25524.2 arose, and companion provisions in California's so-called nuclear laws, are more clearly written with safety purposes in mind. It is suggested that § 25524.2 shares a common heritage with these laws and should be presumed to have been enacted for the same purposes. The short answer here is that these other state laws are not before the Court, and indeed, Proposition 15 was not passed; these provisions and their pedigree do not taint other parts of the Warren-Alquist Act.

461 U.S. 190, 215–16 (1983). And, most recently, in *Abbott v. Perez*, the Court explained that "the presumption of legislative good faith [is] not changed by a finding of past discrimination." 138 S. Ct. 2305, 2324 (2018). In so holding, the Court reiterated its almost forty-year-old statement that "past discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful." *Id.* (quoting *City of Mobile*, 446 U.S. at 74). Even more relevantly, the Court ultimately held that in assessing an equal protection challenge, the relevant focus must be on the legislature that actually enacted the challenged law or policy, not on earlier legislatures:

> The 2013 Texas Legislature did not reenact the [redistricting] plan previously passed by its 2011 predecessor. Nor did it use criteria that arguably carried forward

the effects of any discriminatory intent on the part of the 2011 Legislature. . . . Under these circumstances, there can be no doubt about what matters: It is the intent of the 2013 Legislature.  And it was the plaintiffs' burden to overcome the presumption of legislative good faith and show that the 2013 Legislature acted with invidious intent.

*Id.* at 2325.

Taken collectively, this trio of cases counsel strongly in favor of rejecting the defendant's attempt to shoehorn cherry-picked legislative history from the 1920s into the present-day version of § 1326.  As in *McCleskey*, the defendant's evidence from the 1920s "has little probative value" for understanding Congress's motivation for enacting § 1326 in 1952, to say nothing of its intent in 1988, 1990, 1994, 1996, or 1997.  481 U.S. at 298 n.20.  Similarly, and more fundamentally, *Pac. Gas & Elec. Co.* instructs that viewing § 1326 through the lens of its possible predecessor statute makes little conceptual sense, as the 1929 statute is simply "not before the Court[.]"  461 U.S. at 215–16.  And finally, *Abbott* reinforces the intuitive approach set forth in the Court's prior decisions in *City of Mobile* and *Pac. Gas & Elec. Co.* that legislative intent is not indelibly ingrained in statutory text and that in weighing the motives of legislators in the context of an equal protection challenge, a court's focus should always be on the legislature that passed the challenged law, not on earlier legislatures.  138 S. Ct. at 2324–25.

With these principles in mind, courts of appeals have rejected the "forever tainted" argument urged by the defendant.  For example, in *United States v. Johnson*, 40 F.3d 436 (D.C. Cir. 1994), the D.C. Circuit rejected an argument conceptually identical to that lodged in the defendant's motion.  There, the defendants challenged 21 U.S.C. § 841(b) (enacted as part of the Anti–Drug Abuse Act of 1986) on the grounds that its "sentencing scheme violates the equal protection component of the Fifth Amendment by disproportionately and invidiously impacting blacks through meting out of harsher penalties for offenses involving crack cocaine[.]"  *Id.* at

439.  As part of their challenge, the defendants pointed to racist legislative statements made during debates that preceded a 1914 statute that criminalized cocaine trafficking.  The D.C. Circuit rejected this line of attack in the following terms:

> Appellants urge us to ascribe a discriminatory intent to Congress based on rather sketchy and unpersuasive bits of information.  They point first to the undeniable racism that animated legislative debate leading to the passage of a 1914 statute criminalizing cocaine trafficking generally, long before the crack/powder distinction was contemplated.  We think this information is of no relevance to our inquiry into the motives of the Congress that passed the 1986 Act.

*Id.* at 440 (citing *McCleskey*, 481 U.S. at 298 n.20).  Concluding, Johnson observed that "it would be anomalous to attempt to tar the present Congress with the racist brush of a pre-World War I debate."  *Id.*  Echoing, *Johnson*, the Ninth Circuit has rejected a like challenge to § 841(b):

> In support of his discriminatory purpose argument, Dumas points to the racism which permeated the legislative debates leading to enactment of the Harrison Act of 1914, the first federal law to criminalize cocaine.  The crack/powder cocaine sentencing distinction was adopted in 1986, with the passage of the Anti-Drug Abuse Act.  The changes which occurred in American society between 1914 and 1986-changes brought about in part by successive Congresses and by the impact of the Voting Rights Act on the makeup of Congress itself-make it "anomalous" to ascribe to the 1986 Congress the racism of the Congress of 1914.

*United States v. Dumas*, 64 F.3d 1427, 1430 (9th Cir. 1995) (citing *Johnson*, 40 F.3d at 440).

The intuitive principles applied by *Johnson* and *Dumas* in the criminal context have been applied by courts of appeals with regularity in the civil setting.  In doing so, these courts have recognized that when a state reenacts, for example, a voting provision that was originally intentionally discriminatory, the ultimate focus in subsequent litigation is the intent of the reenacting legislature and not the original one.  For example, in considering a challenge to a voter identification law on the basis of the discriminatory intentions of several Alabama legislators, the Eleventh Circuit rejected the notion that the plaintiffs could prove discriminatory intent through legislative statements having nothing to do with the challenged law.  As it stated:

When we focus on the circumstances surrounding the passage of HB19, it is undisputed that none of the comments in question were made about that legislation. The statements made by current and former Alabama legislators at issue in this case are not "smoking gun" evidence of discriminatory intent in the context of the voter ID law. The fact remains that Plaintiffs cannot point to evidence—not a single comment made by any sitting Alabama legislator in reference to HB19—to support their argument that the voter ID law was intended to discriminate against black and Latino voters.

*Greater Birmingham Ministries v. Sec'y of State for Alabama*, 966 F.3d 1202, 1228 (11th Cir. 2020). Continuing, the Eleventh Circuit held that:

We are mindful of the danger of allowing the old, outdated intentions of previous generations to taint Alabama's legislative action forevermore on certain topics. Plaintiffs point to the racist history of Alabama as a significant barrier for Secretary Merrill to overcome in defending this law. But it cannot be that Alabama's history bans its legislature from ever enacting otherwise constitutional laws about voting.

*Id.* at 1228–29. The Second Circuit has reasoned similarly:

Given this substantive amendment to New York's constitutional provision and the lack of any allegations by plaintiffs of discriminatory intent "reasonably contemporaneous with the challenged decision," *McCleskey*, 481 U.S. at 298 n. 20, we cannot hold that plaintiffs state a plausible claim of intentional discrimination as to the 1894 constitutional provision, which is the bridge necessary for plaintiffs to sufficiently trace any disparate impact of New York Election Law § 5–106(2) "to a purpose to discriminate on the basis of race," *Feeney*, 442 U.S. at 260, 99 S.Ct. 2282.

*Hayden v. Patterson*, 594 F.3d 150, 166–67 (2d Cir. 2010). Other courts are in accord.

*See, e.g., Johnson v. Governor*, 405 F.3d 1214, 1223–24 (11th Cir. 2005) (en banc); *Chen v. City of Houston*, 206 F.3d 502, 520-521 (5th Cir. 2000); *Cotton v. Fordice*, 157 F.3d 388, 391–92 & n.7 (5th Cir. 1998); *accord Riddick by Riddick v. Sch. Bd. of City of Norfolk*, 784 F.2d 521, 539 (4th Cir. 1986) ("We reject plaintiffs' argument that the Norfolk school board must continue to justify all of its actions because of the history of segregation. While that history of discrimination cannot and should not be ignored, it 'cannot in the manner of original sin, condemn governmental action that is not itself unlawful.'" (quoting *City of*

*Mobile*, 446 U.S. at 74)). And, like the Supreme Court recently held, *see Abbott*, 138 S.

Ct. at 2325 ("we have never suggested that past discrimination flips the evidentiary burden

on its head."), these courts have also rejected the proposition that prior intent "remains

legally operative" unless and until some affirmative contrary showing is made. *Johnson*,

405 F.3d at 1223; *Hayden*, 594 F.3d at 166–67; *accord Cotton*, 157 F.3d at 392.

This line of cases makes eminent sense and shows that the holding in *Carrillo-Lopez* is a

far outlier. In any challenge to a statute, the critical focus must be on the contested law itself, not

its two-decade old predecessor. Divining the intent of a particular legislature is a difficult

enough enterprise. The Supreme Court has described it as "a problematic undertaking," *Hunter*

*v. Underwood*, 471 U.S. 222, 228 (1985), and "a hazardous matter," *O'Brien*, 391 U.S. at 383.

Attempting to ascertain the intent of a Congress from 1929 and then imputing it—with no

supporting evidence—to a Congress from 1952 (or 1988, 1990, 1994, 1996, or 1997), is not only

"problematic" or "hazardous:" it is illogical and borderline absurd. This Court should decline

the defendant's invitation to participate in this undertaking.

### 4. The defendant fails to prove disparate impact.

As explained above, the defendant has failed to show any discriminatory purpose on the

part of the Congress that actually passed (or subsequently modified) § 1326. In addition to this

failure, the defendant does not, and is not able to, demonstrate a cognizable disparate impact.

Had SAMUEL-BALDAYAQUEZ cited a higher percentage of illegal-reentry prosecutions of

Mexican and Hispanic defendants as proof of disparate impact and discrimination, this argument

too would fail. As a threshold matter, § 1326 applies to any alien who reenters the United States

illegally. The statute makes no distinctions based on a particular nationality or race and such

laws are presumptively compliant with equal protection principles. *See Vacco v. Quill*, 521 U.S.

793, 800 (1997) ("Generally speaking, laws that apply evenhandedly to all unquestionably comply with the Equal Protection Clause.").

In any event, any statistics SAMUEL-BALDAYAQUEZ might cite are easily the product of geography, not discrimination.  For instance, in Fiscal Year 2019, Customs and Border Patrol had 859,501 total "encounters."  United States Customs and Border Protection, CBP Enforcement Statistics Fiscal Year 2021, available at https://www.cbp.gov/newsroom/stats/cbp-enforcement-statistics (last accessed Oct. 15, 2021).  Ninety-nine percent of those encounters (851,508) occurred on the Southwest border.  United States Customs and Border Protection, Southwest Border Migration FY 2019, available at https://www.cbp.gov/newsroom/stats/sw-border-migration/fy-2019 (last accessed Oct. 15, 2021); see also *Arizona v. United States*, 567 U.S. 387, 397 (2012) ("Arizona bears many of the consequences of unlawful immigration. Hundreds of thousands of deportable aliens are apprehended in Arizona each year.").  Those numbers are neither surprising nor illuminating of Congress's motives in the 1920s.  Indeed, if it were enough to state an equal protection claim that a broad-scale immigration law disparately impacted individuals of any particular ethnicity or nationality—including those from a country sharing 1,954 miles of border with the United States—virtually any such law could be challenged on that ground.  In fact, the Supreme Court recently rejected just this sort of equal protection claim, holding that the disparate impact caused by the rescission of Deferred Action for Childhood Arrivals ("DACA") on Hispanics from Mexico—totaling 78 percent of DACA recipients—did not establish a plausible equal protection claim "because Latinos make up a large share of the unauthorized alien population, [and] one would expect them to make up an outsized share of recipients of any cross-cutting immigration relief program."  *See Regents*, 140 S. Ct. at 1915.  Continuing, the Court noted that "[w]ere this [statistical] fact sufficient to state a claim,

virtually any generally applicable immigration policy could be challenged on equal protection grounds." *Id.* at 1916.

Indeed, the Ninth Circuit has rejected just this sort of statistics-based argument in the context of affirming the denial of a motion to compel discovery with regards to a selective prosecution claim. As it held:

> Sullivan's proposition is that selective prosecution may be inferred because 94.5% of § 1326 defendants are Hispanic males, while only 89% of persons deported from the United States are Hispanic. This statistic is probative of the treatment of similarly situated individuals only if one assumes that deported individuals of different ethnic origins return to the United States at relatively equal rates, and therefore that Hispanics comprise 89% of individuals illegally re-entering the United States. As the district court aptly noted, however, common sense suggests that it would be substantially more difficult for an alien removed to China to return to the United States than for an alien removed to Mexico to do so.

*United States v. Arenas-Ortiz*, 339 F.3d 1066, 1070 (9th Cir. 2003). And of course, these holdings are in accord with longstanding Supreme Court precedent, including *Arlington Heights*, which itself stated that "official action will not be held unconstitutional solely because it results in a racially disproportionate impact." 429 U.S. at 264–65; *see also Pers. Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 272 (1979) ("When the basic classification is rationally based, uneven effects upon particular groups within a class are ordinarily of no constitutional concern."); *Washington v. Davis*, 426 U.S. 229, 242 (1976) ("[W]e have not held that a law, neutral on its face and serving ends otherwise within the power of government to pursue, is not invalid under the Equal Protection Clause simply because it may affect a greater proportion of one race than of another.").

For these reasons, the Court should reject the defendant's attempt to demonstrate a disparate impact.

## **Conclusion**

By any measure, the defendant has failed to carry his burden of showing that § 1326 violates the Fifth Amendment's Equal Protection Clause.  Instead of grappling with the legislative history of the Immigration and Nationality Act of 1952, the defendant opts to train his sights on the statements of government officials from the 1920s who were either no longer in government or were deceased by the time § 1326 was enacted.  The defendant bases his contention on a misguided district court decision that stands in stark contrast of controlling Supreme Court and Circuit precedent.  Although he attaches voluminous pages of congressional material from the 1920s, not a word of that material has any bearing on the law Congress passed in 1952.  See *McCleskey*, 481 U.S. at 298 n.20 ("[U]nless historical evidence is reasonably contemporaneous with the challenged decision, it has little probative value.").

The Supreme Court has cautioned that courts "should be skeptical . . . of a claim that seeks to invalidate a statute based on a legislature's unlawful motive but does so without reference to the content of the legislation enacted." *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 418 (2006).  At bottom, this is exactly the defendant's approach.  The defendant does not engage with the substance of § 1326 or its clear and obvious purpose.  Rather, the entirety of his motion is aimed at legislative history that is several times removed from the current version of the statute.  In the same way "subsequent legislative history is a hazardous basis for inferring the intent of an earlier Congress," *Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 650 (1990), the legislative history of an earlier Congress cannot forever taint a law that has been reenacted repeatedly without animus.

For the foregoing reasons, the defendant's motion to dismiss should be denied.

Respectfully submitted,

BRIDGET M. BRENNAN
Acting United States Attorney

By: /s/ Jason W. White

Jason W. White (NY: 4672267)
Special Assistant United States Attorney
United States Court House
801 West Superior Avenue, Suite 400
Cleveland, OH 44113
(216) 622-3874
(216) 522-8355 (facsimile)
Jason.W.White@usdoj.gov