# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.  4:20-cr-83 |
| | ) | |
| Plaintiff, | ) | JUDGE DONALD NUGENT |
| | ) | |
| vs. | ) | |
| | ) | REPLY TO GOVERNMENT'S |
| | ) | OPPOSITION TO DEFENDANT'S |
| WILLIE ANTONIO SAMUELS-BALAYAQUEZ | ) | MOTION TO DISMISS INDICTMENT |
| | ) | |
| Defendant. | ) | |

Now comes defendant, Willie Antonio Samuel-Baldayaquez, by and through his undersigned attorney, and files this response to the Govenment's opposition to the Defendants's Motion to Dismiss the Indictment on the grounds that § 1326 violates the equal protection gurantee of the Fifth Amendment under the standard articulated in <u>Village of Arlington Heights v. Metropolitan Housing Development Corp</u>, 429 U.S. 252 (1977).  The basis disagreement between the parties seems to be whether a statute which was discriminatory at its origin may become non-discriminatory over time when such law has been amended.  This is the aspect of the issue that will be addressed in the attached Memorandum in Support.

Respectfully submitted,

 S/ David L. Doughten
David L. Doughten
4403 St. Clair Ave.
Cleveland, OH   44103
(216) 361-1112
(216) 881-3928 Fax
ddoughten@yahoo.com

Attorney for Defendant

## CERTIFICATE OF SERVICE

I hereby certify that on the 26th day of October, 2021, a copy of the foregoing was filed electronically. Parties may access this filing through the Court's system. Notice of this filing will be sent by operation of the Court's electronic filing system

 S/ David L. Doughten
David L. Doughten

Attorney for Defendant

## MEMORANDUM IN SUPPORT

In his Motion to Dismiss, Samuel-Baldayaquz relied upon Supreme Court's decision in *Ramos v. Louisiana*, 140 S. Ct. 1390, 206 L. Ed. 583 (2020), in which the Court relied upon historical evidence of a state legislature's racial motives to strike down a criminal law enacted a century earlier. Because "the avowed purpose of the [Louisiana] law was to 'establish the superiority of the white race,' and that the resulting document included many of the trappings of the Jim Crow era: a poll tax, a combined literacy and property ownership test, and a grandfather clause that in practice exempted most white residence from the most onerous of these requirements." *Id*. 1394. Subsequent legislation of voting laws not referring to Jim Crow strategies were not sufficient to undue the taint of the original intent.

Although the law was later reenacted with no evidence of a racial animus, the Court refused to ignore the "racially discriminatory *reasons* that [the state] adopted [its] peculiar rules in the first place." *Id.* at 1401 (emphasis in original). Even the justices' "shared respect for rational and civil discourse" could not "supply an excuse for leaving an uncomfortable past unexamined." *Id*. at 1401 n.44. In other words, the fact that a second law was reenacted years later, did not defeat the original purpose of that law.

In the Government's Response to the Motion to Dismiss, the Government argues the contrary, that the fact that the law has been amended and is no longer invoked in a discriminatory manner has rendered the statute non-discriminatory. Because Congress has updated § 1326 multiple times to increase its deterrent value in a non-discriminatory manner, the original purpose of the law is not longer relevant. The Government cites numerous circuit cases citing holdings that support its argument.

1

But the Government nowhere cites *Ramos v. Louisiana* or argues why that reasoning does not apply here. Therein lies the dispute.

The Government is incorrect in arguing that the entirety of the equal protection argument pivots on the motives of a handful of Congressmen involved in the passing of § 1326's predecessor statute in 1929. Contrary to the argument that there is "no supporting evidence" in imputing the 1929 enactment with the 1952 enactment of § 1356, Samuels-Baldayaquez originally argued racial tinge evidence the latter statute which included :

1. A relative lack of discussion compared to robust Congressional debate regarding other provisions of the INA;

2. Explicit, recorded use of the derogatory term "wetback" by supporters of Section 1326;

3. Congressional silence while increasingly making the provision more punitive; Congress' failure to revise in the face of President Truman's veto statement calling for a reimagination of immigration policy;

4. Knowledge of the disparate impact of Section 1326 on Mexican and Latinx people; and,

5. Passage of the so-called "Wetback Bill" by the same Congress only months prior. (Addressed below in this motion)

The above factors were argued fully in the Motion to Dismiss. As noted, the *Carrillo-Lopez* Court recognized that although the above evidence was circumstantial, and that each instance might not be as probative of an racial animus when considered alone. But in its totality, the cited evidence was sufficient to demonstrate that racial animus was at least one motivating factor behind the enactment of § 1326.

It has been recognized that legislatures are rarely "motivated solely by a single concern," so that a challenger need not show that the legislature's actions "rested solely on

2

racially discriminatory purposes." *Village of Arlington Heights v. Metropolitan Housing Devlopment Corp*, 429 U.S. 252, 265-66 (1977). Instead, the challenger need only show "proof that a discriminatory purpose has been a *motivating factor* in the decision." *Id.* at 265–66 (emphasis added). *See also Arce v. Douglas*, 793 F.3d 968, 977 (9th Cir. 2015) (citing *Arlington Heights*, 429 U.S. at 266–68) (quoting *Arlington Heights* to hold that a challenger need not prove discrimination was the "sole purpose" of the challenged action—only that it was a "'motivating factor'").

In his Motion to Dismiss, Samuel-Baldayaquez argued that the original animus was never rebutted or overcome in subsequent amendments to similar statutes. The government argued that subsequent amendments did remove the racial taint and therefore no equal protection violation has occurred here. A rebuttal of a some of the Government's arguments are addressed here. Samuel-Baldayaquez rests on the arguments in his original Motion to Dismiss on the aspects not addressed below

A.     **Recodification did not cleanse the unlawful reentry statute of its racist origins.**

The Government argues that Congress has updated or modified the statute multiple times since, including in 1988, 1990, 1994, 1996, and 1997. Each time Congress did so, it strengthened the law. This is not disputed here, but the question is does such "strengthening" cleanse the bill of previous racial intent or impact? As noted, here is where the parties disagree. (Doc. #21, Government Response, PageID 475) Silence on a racist aspect of a statute on subsequent amendments does not negate the original premise of that statute.

While it is accurate that Congress has since amended §1326 to make it more punitive, it has never addressed the racism that motivated the original unlawful reentry statute or its

3

recodification. As Judge Du found, "at no point has Congress confronted the racist, nativist roots of Section 1326." *Carrillo-Lopez* at \*24. There is no evidence that the Congress acted with nondiscriminatory motivation—i.e., that "the same decision would have resulted even had the impermissible purpose not been considered"—when it first criminalized reentry in the Undesirable Aliens Act or when it recodified that statute at §1326.

When Congress passed the INA in 1952, it recodified the Undesirable Alien Act's criminalization of reentry at 8 U.S.C. § 1326. Section 1326 adopted the language from the Undesirable Alien Act "almost word for word," *Carrillo-Lopez* at \*7, while other portions of the INA broadened the grounds for deportation and limited discretionary relief from deportation. President Truman harshly criticized the INA, noting it was "most unfortunate" that the bill "would impose harsher restrictions and greatly increase the number of cases deserving equitable relief" while at the same time "narrow[ing] the circle of those who can obtain relief from the letter of the law."

The 1952 Congress was aware of the disparate impact the criminalization of reentry had on Latinxs, and it was aware of its racist underpinnings—but it engaged with neither and overrode President Truman's veto, which explicitly called out the law's discriminatory intent. The only meaningful change Congress made to the statute was expanding it (at the behest of Deputy Attorney General Payton Ford, who included the racial slur discriminatory intent, that happens only where the legislature actively engages with the prior statue and makes substantive changes. *See Abbott v. Perez*, 138 S. Ct. 2305 (2018).

This intuitive understanding of legislative intent is reflected in Supreme Court case law: "It will not be inferred that the legislature, in revising and consolidating the laws, intended to

4

change their policy, unless such intention be clearly expressed." *U.S. v. Ryder*, 110 U.S. 729, 740 (1884). "[W]e do not presume that the revision worked a change in the underlying substantive law unless an intent to make such a change is clearly expressed." *Keene Corp. v. U.S.*, 508 U.S. 200, 209 (1993).

As Judge Du noted in *Carrillo-Lopez*, "a prior version of a statute known to be motivated by racial animus may be considered as infecting its present iteration if it was not, in fact, substantially altered." *Id.* at *10 (citing *Hunter v. Underwood*, 471 U.S. 222, 232–33 (1985) (finding that when a provision's original enactment was clearly motivated by racial animus, later changes did not "legitimate[]" the provision); *see also Ramos v. Louisiana*, at 1410 (Sotomayor, J., concurring) (noting that "many laws and policies in this country have had some history of racial animus" and citing to *U.S. v. Fordice*, 505 U.S. 717, 729 (1992) for the proposition that "policies that are 'traceable' to a State's *de jure* racial segregation and that still 'have discriminatory effects' offend the Equal Protection Clause). "wetback" in his request) to cover those who, like Mr. Samuel-Baldayaquez, are "found in" the United States. *See* 8 U.S.C. § 1326(a)(2).

Recodification does not automatically reset legislative intent. While it is possible for recodification of a racially-motivated law to cure the original law's intent. While the Supreme Court upheld the recodification of a racially-discriminatory law in *Abbott*, it did so only because the legislature actively engaged with the prior statute and made substantive changes. The Supreme Court upheld a 2013 redistricting plan that replaced a 2011 plan after the 2011 plan was found to have been enacted with discriminatory intent. The crucial distinction here is that, in *Abbott*, the 2013 legislature enacted an entirely new redistricting plan explicitly created to "fix

5

the problems identified" (i.e., the discriminatory intent behind the 2011 plan), 138 S. Ct. at 2329, whereas §1326 was nearly identical to the original unlawful reentry statute.

The Supreme Court made clear in *Abbott* that the legislature's original intent remains relevant to determining the intent of the reenacting legislature "to the extent that [it] naturally give[s] rise to—or tend[s] to refute—inferences regarding the intent of the" reenacting legislature. *Id.* at 2327.

**B.      A discriminatory purpose was shown because the 1952 Congress knew about §1326's racist origins—and said nothing**.

To the extent *Abbott* suggests any kind of presumption of a legislature's good faith, such presumption is limited to redistricting cases. *See Abbott*, 138 S. Ct. at 2324 ("'in assessing the sufficiency of a challenge ***to a distrusting plan***,' a court 'must be sensitive to the complex interplay of forces that enter a legislature's redistricting calculus' … [a]nd the 'good faith of the legislature must be presumed'" (citing *Miller v. Johnson*, 515 U.S. 900, 915–16 (1995) (emphasis added)). As Judge Du notes, both *Abbott* and *Miller* justify this presumption on the complexity of redistricting—and there is no reason to believe such a presumption would carry over to a less complex statutory scheme, particularly where it has been shown that the original legislation was motivated by racial animus and the reenacting legislation is nearly identical. *Carrillo-Lopez* at *10 n.21.legislature had taken care "'not to incorporate … any legal defects'" from the 2011 plan. *Abbott* at 2325 (quoting *Perry v. Perez*, 565 U.S. 388, 394 (2012)). In so doing, the Supreme Court stressed that the legislature "did not reenact the plan previously passed by its 2011 predecessor" and therefore had not "carried forward the effects of any discriminatory intent on the part of the 2011 Legislature." *Id*. The Supreme Court concluded: "***Under these circumstances,*** there can be no doubt about what matters: It is the intent of the 2013

Legislature." *Id.* (emphasis added).

With regard to §1326, the 1952 Congress—unlike the legislature in *Abbott*—did not engage with the disparate impact or discriminatory purpose behind the original legislation. Rather, it recodified a racist law without debate, altering it only to make it more punitive, and knowingly "carried forward the effects" of the Act's discriminatory intent (i.e., the disparate impact on Latinxs).

*Abbott* does not shield reenacting legislation from scrutiny where the legislature passes a nearly-identical law without acknowledging, much less addressing, the prior legislation's discriminatory motive or disparate effect. When Congress carries forward legislation that was motivated by racial animus and has produced racially-disparate results (and does so over a presidential veto explicitly calling out the racism of the legislation), it takes no mental gymnastics to find that racial animus remained a motivating factor.

In addition, at the same time, the 1952 Congress's recodification of the Undesirable Aliens Act's unlawful reentry statute, without debate on (and with full knowledge of) the statute's discriminatory intent and disparate impact, establishes discriminatory intent under *Arlington Heights*. In the Government's Reponse, it failed to cite where any of the amendments specifically addressed the racial aspect of the previous statute with the intention of correction the racial aspect of that statute.

The Government is also incorrect on who carries the burden of proof. Once it is established that the law carried a racial animus, the burden switches to the Government. *Hunter v. Underwood*, 471 U.S. 222, 228 (1985) (if racial discrimination was a motivating factor, "the burden shifts to the law's defenders to demonstrate that the law would have been enacted

without this factor."). If the government cannot show that the legislature would have enacted the offending law in the "absence of the racially discriminatory motivation," the law violates the Fifth Amendment and must be invalidated. *Id.* at 225.

The unfortunate history of §1326 is really not under dispute. The Government's only contra argument has to be that even if the original enactment of the statute was at least partially racially motivated, the statute is not currently being enforced in a discriminatory fashion. This may or may not be true. But the current enforcement policy is a non-consideration under *Arlington Heights*.

**Conclusion**

Because 8 U.S.C. 1326 would not have be enacted absent racial animus it violates the equal protection guarantee of the Fifth Amendment under the standard of *Village of Arlington Heights v. Metropolitan Housing Development Cor*p., 429 U.S. 252 (1977), the charges here must be dismissed.

Respectfully submitted,

 S/ David L. Doughten
David L. Doughten

Attorney for Defendant